Kevin **DIETERICH**, on behalf of himself and all other similarly situated, Plaintiff,

v.

James A. **HARRER**, Donald R. Farrow, Phillip E. Pearce, John R. Snedegar, Barry W. Sullivan, Borland Software Corporation, a Delaware corporation, Dale L. Fuller, Frederick A. Ball, Keith E. Gottfried, and Douglas W. Barre Defendants.

No. Civ.A. 024–N.

Court of Chancery of Delaware, New Castle County.

Submitted May 26, 2004.
Decided Aug. 3, 2004.

---

Elizabeth M. McGeever, Tanya P. Jefferis, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Daniel C. Girard, Aaron M. Sheanin, Anthony K. Lee, Girard Gibbs & DeBartolomeo LLP, San Francisco, California, for the Plaintiff, of counsel.

R. Judson Scaggs, Jr., Charles D. Reed, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; David J. Berger, Jared L. Kopel, Kent W. Easter, Tasneem Dohadwala, Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California, for the Defendants.

## OPINION AND ORDER

LAMB, Vice Chancellor.

### I.

A stockholder of a company that was acquired in a merger brings a complaint alleging that the former directors violated their duty of loyalty in connection with the pursuit of alternative transactions that, eventually, resulted in the merger. In this opinion, the court concludes that some of the claims alleged are derivative in nature and, therefore, that the plaintiff has lost standing to pursue those claims. The court also concludes, however, that the complaint adequately states claims challenging the entire fairness of the merger and the disclosures made in connection with it.

### II.

#### A. *The Parties* [1]

Plaintiff Kevin Dieterich was a stockholder of Starbase Corporation ("Starbase" or the "Company"), a California-based software and consulting company that was incorporated in Delaware. Dieterich tendered his Starbase shares into the first step of a two-step tender offer/cash out merger in which Borland Software Corporation acquired Starbase. Borland completed this acquisition in January 2003. Dieterich purports to act as class representative for former Starbase shareholders whose shares were acquired in either the tender offer or the merger.

Defendants James Harrer, Donald Farrow, Phillip Pearce, John Snedegar and Barry Sullivan (collectively, the "Starbase Directors") were directors of Starbase during the relevant period. In addition, Harrer was President and CEO, Farrow was Executive Vice President, and Snedegar was Chairman of the Starbase board of directors.

Defendant Borland is a software and consulting company that is incorporated in Delaware and maintains its headquarters in California. Defendants Dale Fuller, Frederick Ball, Keith Gottfried, and Douglas Barre were all officers of Borland during the period that it was negotiating to acquire Starbase. Fuller was President and CEO; Ball was CFO; Gottfried was General Counsel; and Barre was COO. These same four individuals (collectively, the "Borland Officer Designees") became directors of Starbase when Borland closed its tender offer in November 2002 and remained directors of Starbase until the completion of the second step merger.

#### B. *Starbase's Woes And Its Board's Effort To Find Financing*

Throughout 2001–2002, due to general weakness in the software sector and poor sales performance, Starbase found itself on the brink of insolvency. SG Cowen Securities Corporation, acting as Starbase's financial advisor, solicited expressions of interest for a broad range of transactions, including equity financings and a sale of the company. In response, Borland and another software enterprise, non-party Serena Software Company, separately ex-

---

1. All facts herein are taken from the well-pleaded allegations of the complaint.

pressed interest in acquiring Starbase. Discussions with Borland began as early as July 2001 and continued, intermittently, for the next 15 months. Initially, Borland indicated interest in the $40–$45 million range. Serena quickly indicated interest at a somewhat higher valuation level, and in November 2001 Starbase entered into an exclusivity agreement with Serena to negotiate the terms of a merger.

Soon thereafter, Starbase consummated a private equity placement pursuant to which several firms invested $3 million in Starbase, giving one of those firms the right to nominate a director to Starbase's board of directors. The investor exercised that right by naming Harrer to the board. Soon thereafter, Harrer became Starbase's President and COO. In April 2002, Harrer became CEO of Starbase.

After learning that Starbase planned on doing additional equity investments, Serena withdrew its expression of interest in December 2001. Nevertheless, over the ensuing months, William Stow, then Chairman of the board and CEO of Starbase, continued to pursue discussions with Serena and Borland, both of which remained interested in a possible acquisition of Starbase. As will be discussed, below, Harrer is alleged to have interfered with these discussions because he was more interested in pursuing "one or more private equity financings in which he and others acting in concert with him would participate, to the detriment of existing Starbase shareholders."

In this connection, Harrer allegedly told Stow that he was not interested in any acquisition discussions and that his management team had no time to meet with Borland. Harrer is also alleged to have agreed to meet with Serena but then to have made disparaging remarks about Starbase's prospects and discouraged further acquisition discussions.

On April 3, 2002, Stow resigned his offices and was succeeded as Chairman by Snedegar and as CEO by Harrer. Stow remained on the board, however, and was given a contract to spearhead the company's continuing efforts to negotiate a merger with a stronger enterprise. At the same meeting, Harrer advised the board of ongoing discussion with Special Situations Fund ("SSF") along with six other institutional investors (together, with SSF, the "SSF Investors") for a new round of equity investment.

Two weeks later, during a telephonic board meeting, Harrer discussed a written term sheet received from SSF. The proposal called for Starbase to engage in a 10:1 reverse stock split to be followed by the investment of $10 million in cash in return for the issuance of a new series of preferred stock (with warrants) having the effect of substantially diluting the existing common equity interest (the "SSF Transaction"). The complaint alleges that the SSF Transaction could have resulted in the SSF Investors and those associated with them holding over 50% of the outstanding common stock, and, thus, was a change of control transaction. Nevertheless, as the defendants point out, there is no allegation in the complaint that the SSF Investors were affiliates of one another or bound by any agreement to act together as stockholders of Starbase. Thus, the defendants maintain, the complaint does not support an inference that the SSF Transaction would have resulted in a change of control.

On April 18, 2002, the board resolved to approve the SSF Transaction term sheet after Harrer and Farrow represented to them that the SSF Transaction was the best they had been able to find. The board also instructed Harrer to continue exploring an acquisition by Borland, Serena or another stronger corporation. Sev-

eral days later, the board discovered that Harrer, Snedegar and Farrow planned to participate as investors in the SSF Transaction "and obtain substantial amounts of Starbase common stock at below-market prices."

Meanwhile, Harrer allegedly continued to sabotage other possible transactions in favor of the SSF Transaction. One week after the April 18 board meeting, at the insistence of Stow and SG Cowen, Harrer met with Borland representatives and bankers for Borland and Starbase. Harrer allegedly stated that Starbase was not for sale to anyone, invited Borland to join the SSF Transaction, and disclosed to Borland (which had earlier made an indication of interest as high as $41 million) confidential information that the SSF Transaction was based on a $25 million valuation of Starbase. In addition, the complaint alleges that, Harrer took steps to discourage other possible refinancing transactions that might have been more favorable to Starbase's existing shareholders.

Borland, however, was not immediately discouraged by Harrer's hostility; nor did it lower its expression of interest. Instead, in a letter of intent dated May 5, 2002, Borland offered to acquire Starbase for $40–45 million in cash.

The board met on May 8, 2002. In response to the Borland expression of interest, Snedegar allegedly orchestrated the disbanding of Starbase's Mergers and Acquisitions Subcommittee, which was composed of disinterested directors. The board then delegated responsibility for continuing merger negotiations to Harrer and Farrow, who again recommended the SSF Transaction in which they allegedly had a personal interest.

At that same meeting, the Starbase directors decided that the SSF Transaction agreement needed to include a fiduciary-out clause to allow the board to accept a better offer, if one arose. "More specifi-

cally, the Starbase board recognizing that an offer by Borland or Serena in the range of $45–50 million would be more beneficial to Starbase shareholders than a highly dilutive private equity financing, expressly conditioned its approval" of the SSF Transaction on the inclusion of a fiduciary-out clause the transaction agreement.

Harrer then negotiated the financing contract with SSF without an effective fiduciary-out and allegedly then falsely told the board that he had obtained the required provision in the contract. According to the complaint, Harrer omitted the required clause in order "to prevent other merger or financing proposal from endangering consummation of the SSF [T]ransaction, from which Harrer stood to benefit personally."

The board met again on May 13, Snedegar allegedly tricked the directors into giving their approval of the SSF Transaction by assuring them the required fiduciary-out clause was contained in the agreement and the discussions with Borland and Serena would continue. Farrow allegedly knew Harrer did not procure a proper fiduciary-out clause but remained silent. Based on these representations, the board executed a unanimous written consent, dated May 20, 2002, approving the SSF Transaction agreement.

During a May 28, 2002 telephonic board meeting, Stow questioned Starbase's viability as an independent company. An SG Cowan representative made a presentation to the board expressing the view that the then-current Borland offer was significantly more valuable to Starbase's stockholders than the SSF Transaction, or any other attempt to keep Starbase independent.

During the first week of June 2002, Serena expressed an interest in acquiring Starbase for $50 million, and Borland "was prepared to offer" $47 million. The board met again on June 11 to discuss the three

possible transactions, and, with Harrer dissenting, resolved to enter into a second exclusivity agreement with Serena. Serena began to conduct due diligence but soon discovered that the SSF Transaction agreement did not contain an acceptable fiduciary-out clause. Only on June 17, 2003, did the board discover that Harrer had failed to procure the fiduciary-out clause and that the Company was locked into the SSF Transaction. Given this discovery, both Borland and Serena withdrew their expressions of interest.

The board met on June 27, 2002, and discussed whether to reconsider its vote on the SSF Transaction agreement due to the absence of an effective fiduciary-out provision. Starbase's outside counsel allegedly warned against doing so because any conflicting vote on the SSF Transaction would require public disclosure and would likely result in shareholder litigation against the directors. The board's failure to obtain a fiduciary-out could be alleged to have impeded the acquisition of Starbase on terms more favorable to Starbase stockholders than the SSF Transaction. Thus, the complaint alleges that the directors violated their duty of loyalty by resolving to continue with the SSF Transaction, "rather than advise SSF that Harrer had acted beyond the scope of his authority." Definitive proxy material for a meeting scheduled for July 29, 2002 was filed with the SEC on June 20, 2002, and mailed to stockholders.

### D. The Collapse Of The SSF Transaction

On July 17 and 27, respectively, the largest and second largest SSF Investors backed out of the SSF Transaction, a fact that Starbase failed to disclose either in advance of or at the July 29 shareholder meeting. Unaware of these facts and relying on proxy material that is alleged to have been materially deficient for other reasons, Starbase shareholders voted to approve the SSF Transaction.

On August 8, Starbase announced that the two investors had withdrawn. On August 14, it announced that the SSF Transaction had collapsed and that the board was seeking other options.

### E. The Borland Merger

The collapse of the SSF Transaction is alleged to have left Starbase with few options. Borland came forward, offering to purchase Starbase for $24 million, half the amount of its indication of interest in June. Serena did not reenter the bidding, and, with no alternatives, on October 8, 2002, the board resolved to accept Borland's offer. On the same day the board authorized an agreement and plan of merger, contemplating a two-step acquisition of Starbase by Borland. The board unanimously recommended the merger to shareholders in a Schedule 14D–9 filed on October 11. The complaint alleges that this document was materially misleading in failing to disclose the facts relating to the misconduct alleged in connection with the SSF Transaction.

Borland completed its first-step tender offer on November 22, purchasing enough stock to become Starbase's majority shareholder. The Borland Designees were then appointed to serve as directors of Starbase on November 25, replacing Harrer, Farrow, and another director. The new board called a shareholder meeting to vote on the proposed merger with Borland for January 7, 2003. On December 6, 2002, the board caused Starbase to file a Schedule 14C with the SEC that outlined the circumstances leading to the proposed merger and recommended a yes vote. Dieterich claims this document was materially misleading because it did not disclose the long history of misconduct surrounding the board's exploration of alternatives during 2002. Starbase's shareholders approved the Borland merger on January 7, 2003.

## F. *The Claims And Defenses*

The complaint makes three general claims. The first names the Starbase Directors (Harrer, Farrow, Pearce, Snedegar and Sullivan) and is framed as a breach of the *Revlon* duty to maximize the return to stockholders in authorizing the SSF Transaction. Harrer, Farrow and Snedegar are alleged to have violated their fiduciary duty of loyalty by sabotaging early negotiations with Borland and Serena in favor of the SSF Transaction, in which they had a personal interest, as well as by their failure to include a fiduciary-out clause in the SSF Transaction agreement. All of the Starbase Directors are alleged to have violated their fiduciary duties when, after the full board became aware of the omission of that clause, they chose to reauthorize the SSF Transaction instead of insisting on the right to terminate that agreement and renew discussions with Serena or Borland. This claim is also alleged as a loyalty violation since the directors' failure to act is alleged to have resulted from concern over their personal liability. As a result, it is alleged, the Starbase Directors failed to pursue the Serena and Borland opportunities representing "the best value reasonably available." The complaint alleges that the class suffered damages "currently estimated at $24 million, which is the approximate amount by which Starbase's acquisition price was ultimately reduced as a result" of the misconduct alleged.

Second, Dieterich claims that the Starbase Directors violated the duty of disclosure by filing false and misleading proxy material in connection with the SSF Transaction and in failing to provide truthful and accurate information about that proposed transaction in other material respects. These misstatements and omissions are alleged to have caused a "quantifiable" economic loss to the class, although the vote cast on the SSF Transaction was, in the end, of no consequence when the transaction was abandoned. The complaint also alleges that these same directors (other than Pearce) violated their duty of disclosure by publishing a materially false and misleading Schedule 14D-9 Solicitation/Recommendation Statement in connection the Borland tender offer. In addition, the complaint alleges that Borland, the Borland Designees, Snedegar, and Sullivan all violated the duty of disclosure in publishing the allegedly false and misleading 14C Information Statement in connection with the second-step squeeze-out merger.

Finally, the complaint alleges an entire fairness claim against the Director Defendants, asserting that the merger was approved by a majority of interested directors and was the product of an unfair process that resulted in an unfair price. The complaint alleges that Borland's acquisition of Starbase was tainted by unfair dealing because of Harrer's April 2002 disclosure to Borland of the $25 million valuation underlying the SSF Transaction, and that Borland made use of this information in offering to pay only $24 million in October, after the SSF Transaction cratered and after Serena stopped competing.

The entire fairness claim also alleges that the process by which the Borland merger occurred was tainted by the failure of "Harrer, Farrow and Snedegar to negotiate for and include in the SSF [T]ransaction agreement the fiduciary-out demanded by the Starbase board" and, more generally, by the other alleged breaches of fiduciary duty in connection with the SSF Transaction. The absence of a fiduciary-out clause in the SSF Transaction agreement caused Serena to withdraw as a merger candidate, "enabling Borland to make an acquisition offer at a reduced price." In addition, the complaint attacks the provisions of the Borland

merger agreement itself that provided the Starbase Directors with rights of indemnification and continued D & O insurance coverage for a period of six years after the conclusion of the merger.

Finally, the complaint alleges that the unfair process resulted in an unfair price, as follows: "Had Harrer and the other Director Defendants not interfered with the earlier merger negotiations in spring 2002 by committing Starbase to the SSF [T]ransaction without a fiduciary-out provision, Starbase would have been acquired for nearly twice that which Borland eventually paid. Thus, the $24 million acquisition price paid by Borland was unfair to Starbase's shareholders." The price is also alleged to be unfair because it does not reflect the value of any derivative claims that might have arisen for the course of misconduct alleged and because it reflected a reduction made by Borland to account for the cost of indemnifying the Starbase Directors.

The defendants have moved to dismiss, arguing that Deiterich's claims are all derivative in nature and Dieterich lacks standing to maintain any derivative action because he tendered his shares to Borland. The defendants also advance a variety of other arguments, as follows: (1) the SSF Transaction agreement contained, at worst, an ineffective fiduciary-out provision, so the Starbase Directors at most could have violated their duty of care; (2) because the SSF Transaction never went through and the Starbase Directors were therefore never able to invest, they only "attempted" to breach their fiduciary duties; (3) the disclosures Dieterich complains are missing amount to self-flagellation; and (4) any damages must be speculative because, in early 2002, Borland and Serena had only made expressions of interests, not actual offers.

### G. *The California Action*

■ The defendants also raise the procedural defenses of *res judicata* and collateral estoppel resulting from a prior litigation in the California Superior Court. Dieterich filed a complaint in California that is similar to the complaint filed here, although here he has added the Borland Defendants and included an entire fairness attack on the Borland merger. The California Superior Court, applying Delaware law, dismissed that prior complaint, finding, *inter alia*, that any claim presented was derivative and any damages would be speculative because neither Borland nor Serena had made an actual offer before Borland's $24 million bid. In pertinent part, however, that dismissal also granted Dieterich leave to amend in order to attempt to state a direct claim.

Dietrich filed an amended complaint, and then, on the next court day, moved for a voluntary dismissal without prejudice. Sensing what was afoot, the defendants sought assurances that Dieterich was not dismissing merely to refile in another forum. After Dieterich's counsel stated that he had not yet decided whether to file in another forum, the court allowed a dismissal without prejudice. Two months later Dieterich filed a complaint in this court.

The defendants responded by petitioning Judge Sundvold of the California Superior Court to change his former order to one of dismissal with prejudice. Judge Sundvold acknowledged that Dieterich appeared to have acted in bad faith so that he could forum shop, but refused the defendant's request. Thus, the dismissal of the California was and remains a "without prejudice" dismissal.

### III.

Addressing the procedural preclusion argument first, this court, like the California court, is skeptical of Dieterich's good

faith in re-filing his action here and certainly agrees that he is engaged in forum shopping. Nonetheless, the California court refused to order a dismissal "with prejudice" two months after Dieterich filed this complaint. Because that order is "without prejudice" and is not entitled to preclusive effect under California law,[2] it will not be regarded as preclusive by this court.

The defendants attempt to avoid this result by analogizing the California court's order dismissing Dieterich's first complaint with leave to amend to a dismissal with prejudice under Court of Chancery Rule 12(b)(6). This means, they say, that because the California court already determined that Dieterich's first complaint failed to state a claim for relief, and because Dieterich's complaint here is very similar to that complaint, *res judicata* prevents a redetermination of its legal sufficiency. The problem with this argument, which is based on *Bailey v. City of Wilmington*,[3] is that the prior judgment in this case is not final. A voluntary dismissal in California is more properly analogized to a voluntary dismissal under Court of Chancery Rule 41(a), which cannot be the basis of a *res judicata* or collateral estoppel defense.[4]

The defendants' suggest that Judge Sundvold's opinion was "final" as to the specific legal question it addressed, the sufficiency of Dieterich's first complaint, and can therefore serve as basis for *res*

*judicata.* If Dieterich had simply refiled the same complaint previously rejected in California, this court would have no trouble dismissing it as duplicative. However, it is not the same complaint; Dieterich has added claims, facts, and parties. This is precisely what Judge Sundvold seems to have expected when he granted Dieterich leave to amend.

The California Superior Court's grant of leave to amend and subsequent refusal to dismiss with prejudice means that Dieterich has a right to have his complaint heard somewhere. Judicial efficiency would be ill served by sending the case back to California for further briefing and argument when this court can readily address the questions of Delaware law that it presents. This is particularly true in light of recent developments in our law that redefine the distinction between direct and derivative claims that militate in favor of having a Delaware court resolve the issue.[5]

## IV.

The motion to dismiss focuses on the first and fifth counts, alleging breaches of fiduciary duty in connection with the SSF Transaction (Count I) and lack of entire fairness in connection with the Borland acquisition (Count V). The defendants argue that, if those counts state claims at all, those claims are derivative rather than direct. Dieterich concedes that, as a result of the Borland merger, he lost standing to sue derivatively on behalf of Starbase.[6] Thus, if either Count I or Count V

---

**2.** Under California law, where a demurrer is sustained with leave to amend, a plaintiff who files an amended complaint and then takes a voluntary dismissal is free to refile in another court. *See Christensen v. Dewor Devs.*, 33 Cal.3d 778, 191 Cal.Rptr. 8, 661 P.2d 1088 (1983), superseded by statute on other grounds.

**3.** 766 A.2d 477, 481 (Del.2001).

**4.** *See e.g. In re Piper Aircraft Distribution Sys. Antitrust Litig.*, 551 F.2d 213 (8th Cir.1977)

(finding that neither *res judicata* nor collateral defenses can be based on a voluntary dismissal with leave to amend under Fed.R.Civ.P. 41(a)(1), which is identical to Court of Chancery Rule 41(a)(1)).

**5.** *See Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del.2004).

**6.** *See Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del.1984) ("A plaintiff who ceases to be a shareholder, whether by reason of a merger,

is properly viewed as derivative in nature, it must be dismissed.[7]

 The court's analysis of this issue is guided by the Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* which discarded the old "special injury" test, i.e. whether the plaintiff has suffered an injury different from that suffered by shareholders in general, for determining whether a claim is direct or derivative.[8] Instead, *Tooley* instructs this court to consider only two questions in determining that issue: "(1) who suffered the alleged harm (the corporation or the stockholders); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)".[9] This change in the law closely followed *Agostino v. Hicks,* wherein Chancellor Chandler defined what would become the first prong of the *Tooley* test: "Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?"[10] *Tooley* cites this definition approvingly.[11]

## A. Recent Direct vs. Derivative Case Law

Interestingly, dictum in *Agostino* describes the circumstances of this case as an example of a derivative claim under the *Tooley* test. "[A] complaint that directly challenges the fairness of the process and the price of a merger suggests, to my mind, that the corporation suffered harm in the form of inadequate consideration for the sale of itself as a going concern and that the harm suffered by shareholders is only a natural and foreseeable · consequence of the harm to the corporation."[12] The Chancellor continued in a footnote, "It is unclear why a 'direct' challenge to a merger price is *ipso facto* a 'direct' claim. If a 'direct' challenge to a transaction gives rise to a direct claim, I cannot ascertain in any principled manner why a 'direct' attack on a non-merger transaction would not also state a 'direct' claim obviating a plaintiff's need to adhere to the procedural prerequisites of bringing a derivative claim."[13]

This reasoning, the Chancellor acknowledged, conflicts with language in *Parnes v. Bally Entm't Corp.,*[14] which *Tooley* also endorsed. There the Supreme Court held that "[a] stockholder who directly attacks the fairness or validity of a merger alleges an injury to stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated.... [I]n order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[15] In *Parnes,* the shareholders alleged that the CEO of Bally's Hotels demanded a $70 million bribe from compa-

---

or for any other reason, loses standing to continue a derivative suit.").

7. The remaining counts of the complaint allege violation of the duty of disclosure and, if they state claims for relief, those claims can be pursued directly by Dietrich.

8. 845 A.2d 1031 (Del.2004).

9. *Id.* at 1033.

10. 845 A.2d 1110, 1122 (Del.Ch.2004)

11. 845 A.2d at 1036.

12. *Agostino,* 845 A.2d at 1119 (citing *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1245 (Del. 1999)).

13. *Id.* at n. 5.

14. 722 A.2d 1243.

15. *Id.* at 1245.

nies interested in merging with Bally's to secure his consent for any possible transaction. This allegedly scared off companies who may have offered a better price than that ultimately offered by Hilton Hotels when (the complaint alleged) it paid the bribe and bought Bally's. The court found that this allegation of unfair price and process stated a direct claim.

■ The above quoted language in *Parnes* might be read as suggesting that all shareholder claims for breach of fiduciary duty are direct if they involve a merger. That is not, of course, the law. For example, the court in *In re First Interstate Bancorp Litigation* stated as follows: "claims arising from transactions which operate to deter or defeat offers to purchase the subject company's stock, i.e., entrenchment claims, are generally found to be derivative in nature."[16] Further, as Vice Chancellor Strine noted in *Golaine v. Edwards*,[17] *Parnes* simply means that a shareholder makes a direct claim by alleging that director conduct in a transaction that eliminates shareholders is so egregious as to materially affect the price paid in that transaction.

## B. *The Count I Claim Is Derivative*

■ *Tooley* provides a two-element test: (1) who was injured and (2) who should recover. *Tooley* does not, however, abandon all prior jurisprudence on the direct/derivative distinction. Even after *Tooley*, a claim is not "direct" simply because it is pleaded that way, and mentioning a merger does not talismanically create a direct action. Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.[18]

Count I does not involve the ultimate Borland merger. Rather, it focuses on the actions leading up to the ill-fated SSF Transaction. The breach of the duty of loyalty alleged in Count I is that Harrer, Farrow, and Snedegar sabotaged negotiations with Serena and Borland to steer the Company to the SSF Transaction that they favored, and that the other directors ratified this transaction after learning about the missing fiduciary-out to avoid being named defendants in a stockholder litigation. Although the complaint is unclear on this point, the damages presumably would be the lost opportunity for Starbase to sell itself to either Serena or Borland in June at a substantially higher price that might have been available at that time.

Applying the first prong of the *Tooley* test, the duty implicated in Count I of the complaint is plainly the directors' normal duty to manage the affairs of the corporation, albeit in the context of a corporation searching for alternatives. That duty is owed to the corporation and not separately or independently to the stockholders. In *Agostino*, the Chancellor discussed a very similar situation and concluded that the breach of duty alleged was of a duty owed to the corporation:

> These series of events ... would have harmed the Company because the Company would have been precluded from entering into a transaction that would have maximized the return on its assets. The plaintiff has advanced no argument as to why all shareholders would not be affected equally by such an occurrence. Nor is there any claim that the preclusion of alternative, value-maximizing transactions implicates a contractual right of plaintiff. In my opinion, the

---

16. 729 A.2d 851 (Del.Ch.1998).

17. 1999 WL 1271882 (Del.Ch. Dec.21, 1999).

18. *Agostino*, 845 A.2d at 1121 (citing *Lipton v. News Int'l. Plc.*, 514 A.2d 1075, 1078 (Del. 1986)).

nature of this claim is nothing more than a claim of mismanagement that, "if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders." As such, "the wrong alleged is entirely derivative in nature." [19]

Similarly, it is equally clear—applying the second prong of *Tooley*—that any monetary recovery for the breaches of duty alleged in Count I would properly belong to the corporation, rather than to the stockholders personally or any ill-defined subset of them.[20] The misconduct alleged in Count I simply never resulted in an event or transaction that could have injured the stockholders directly, rather than indirectly as a result of their ownership of Starbase shares.

## C. *The Entire Fairness Claim Is Direct*

Count V presents a different issue. The basic theory of Count V is that the misconduct alleged in Count I was an integral part of and unfairly infected the final merger negotiations with Borland in a number of ways. Among other things, the complaint points to the following acts or consequences of acts that, it says, unfairly caused a reduction in the price paid by Borland:

- Harrer's "tip" to Borland of the $25 million confidential valuation of Starbase;
- Harrer's repeated rebuffs of expressions of interest by Serena or Borland;
- Harrer's deliberate failure to obtain a fiduciary-out clause in the SSF Transaction agreement, causing Serena and Borland to terminate discussions in

June at price levels approaching $50 million;
- The collapse of the SSF Transaction and the resulting distraction and delay that permitted Borland to emerge as the only available merger partner.

■ Dieterich also alleges that Harrer, Snedegar, and Farrow, who constituted a majority of the board at the time the Borland transaction was approved, had a disabling conflict of interest in voting in favor of that merger. Allegedly, these three were motivated to find an alternative to the failed SSF Transaction to protect themselves from personal liability. In this connection, the complaint alleges that the Borland merger agreement requires Starbase to maintain all rights to indemnification in favor of its former directors and officers for a period of six years after the merger and also to maintain D & O insurance for that same period.

Dieterich points to all of these allegations and argues that he has successfully alleged a direct attack on the merger under *Parnes*. The defendants respond that the chain of causation between the alleged misconduct involving the SSF Transaction and the eventual merger with Borland is too attenuated to support a direct challenge to the fairness of that transaction. Citing *Turner v. Bernstein*,[21] they argue that "[a]llegations of a breach of fiduciary duty in a related transaction, which allegedly lowers the value paid in the merger, and impacts all stockholders equally, constitute a derivative—not direct—claim." [22]

■ *Parnes* stands for the proposition that a direct attack on the fairness or

---

19. 845 A.2d at 1123 (quoting *Kramer v. W. Pacific Ind., Inc.*, 546 A.2d 348, 352 (Del. 1988)).

20. Indeed, any recovery on Count I would have belonged to the corporation, if only because there is no rational way in which to

define a class differing from all of the shareholders at the time the judgment is entered.

21. 1999 WL 66532, at *4–*5 (Del.Ch. Feb.9, 1999).

22. Defs' Opening Br. at 28.

validity of a merger can be maintained as an individual or direct action.[23] Of course, as *Parnes* candidly points out "it is often difficult to determine whether a stockholder is challenging the merger itself, or alleged wrongs associated with the merger."[24] Somewhat helpfully, the opinion in *Parnes* goes on to explain that "[i]n order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[25]

Although the matter is hardly free from doubt, assuming the truth of the well-pleaded allegations of the complaint and drawing all reasonable inferences in favor of the plaintiff, *Tooley* and *Parnes* support the conclusion that Count V states a direct claim for relief on behalf of a class consisting of those persons who tendered in response to the Borland tender offer or whose shares were cashed out in the merger. This conclusion is not "free from doubt" because the deal ultimately negotiated with Borland in October 2002 can be seen as being causally unrelated to the fiduciary misconduct alleged in the April—June 2002 timeframe. This would even more clearly be the case if the ultimate merger partner was a third party with no connection with the earlier negotiations.

As it is, the necessary connection between the misconduct alleged in the time frame leading up to the failure of the SSF Transaction and the merger is found in the allegation that Harrer supplied Borland with a confidential $25 million valuation of Starbase. From this, Dieterich infers that Borland relied upon that information when it later offered $24 million in the merger. To a skeptical mind, this is a hard inference to draw for a number of reasons.

First, immediately after this alleged tip, Borland made indications of interest at up to $47 million to buy Starbase. Second, the collapse of the SSF Transaction several months later suggests a continuing deterioration in Starbase's financial condition. Third, the complaint nowhere alleges that the price paid in the merger did not represent fair value for Starbase by the end of 2002 (excluding the elements of value flowing from the potential derivative claims). Nevertheless, if Dieterich can show the causal relationship after a period of discovery, the claim would support a direct action and a class-based recovery.

In light of this holding, the court will not address at this time the other elements of Dieterich's alleged "direct" attack on the Borland merger, such as the claim that a majority of the directors approving the transaction were interested as a result of the indemnification and insurance provisions contained therein. Although those claims are of the sort often thought to give rise to derivative, rather than direct claims, the court will permit discovery into all aspects of the negotiation of the transaction documents and the possible interests of the Starbase directors therein.

For these reasons, the court will not dismiss Count V.

## V.

Dieterich's disclosure allegations are direct claims, as they are based in rights secured to stockholders by various statutes. The court will address them *seriatim.*

■ The first disclosure claim (Count II) relates to the proxy statement disclosures made in connection with the SSF Transaction. That transaction was ap-

**23.** 722 A.2d at 1245.

**24.** *Id.*

**25.** *Id.* (citing *Kramer,* 546 A.2d at 354).

proved but never effectuated. The court agrees with the defendants that any claim based on that proxy material is moot because the SSF Transaction never happened and, thus, no Starbase stockholder could show injury resulting from his or her reliance on those disclosures. In addition, the class defined in the complaint (those who tendered to Borland or were cashed out in the merger) is not a proper class to assert claims based on disclosures made in months earlier in connection with a different proposed transaction. Therefore, Count II will be dismissed.

Counts III and IV relate to the Starbase Schedule 14D-9 disseminated in connection with the Borland tender offer (Count III) and the Schedule 14C Information Statement disseminated in connection with the follow-up merger (Count IV). Borland and the Borland Designees (together with Snedegar and Sullivan) are named as defendants in Count IV. Because the court has determined that Count V states a viable entire fairness claim against the Starbase Directors, it is more appropriate to defer consideration of the motion directed at Count III until later proceedings in this case.[26] Those claims track the substantive allegations of misconduct and, thus, are more appropriately examined in connection with the challenge to the merger.

■ The court takes a different view of the claims in Count IV against Borland and the Borland Designees concerning the Information Statement. Until the completion of its first step tender offer, Borland was an unrelated third party, and the Borland Designees were strangers to Starbase. The Borland parties had no responsibility for the proxy materials issued in connection with the proposed SSF Transaction or for the disclosures made in the Starbase Schedule 14D-9.

Borland's tender offer closed on November 22, 2002 and it gained control of the Starbase board on November 25, 2002. Eight business days later, Starbase issued the Information Statement challenged in Count IV. The court infers from the sequence of events and the complaint that the disclosures in the Information Statement that Dieterich claims are untrue or misleading are largely, if not entirely, a republication of the disclosures made in those earlier documents. The complaint alleges that the Information Statement "was issued in the name of the Starbase [b]oard" (i.e. Snedegar, Sullivan, and the Borland Designees) and that Borland played "a substantial role in the preparation and distribution" of that document.[27] These allegations are barely enough to get past a motion to dismiss. Nevertheless, unless the plaintiff is eventually able to show that Borland or the Borland Designees knew or had reason to know that these earlier Starbase disclosure documents were materially false or misleading, it is unlikely that any of them will be held liable for republishing that same disclosure in the Information Statement. There is simply no sense in a rule that requires an unrelated third party acquirer or its new board designees to conduct an internal investigation of the target company directors' conduct of their fiduciary duties before issuing proxy materials containing already published disclosures for the purpose of effectuating the second step of an arm's-length, integrated acquisition.

For these reasons, if Dieterich decides to proceed on Count IV against Borland or the Borland Designees, he will be entitled to a limited scope of discovery to determine whether there is a triable issue of fact on those claims. After the completion of that discovery, on a schedule to be

---

**26.** Count III does not name Pearce as a defendant, although he is named in Count V.

**27.** Compl. ¶ 66.

establish by court order, Dieterich will be required to furnish to Borland and the Borland Designees responses to contention interrogatories that specify all of the evidence on which Dieterich proposes to rely in establishing the liability of those parties under Count IV of the complaint.

## VI.

For the foregoing reasons, the defendants' motion to dismiss Count I and Count II is GRANTED. The motion to dismiss Count III and Count V is DENIED. The motion to dismiss Count IV is DENIED subject to the conditions stated in this opinion. IT IS SO ORDERED.