Moskowitz, J. (dissenting).
In 1927, in Continental Ins. Co. v Mercadante (222 App Div 181 [1927]), this Court held actionable a claim for fraudulent inducement to retain, rather than sell, a security. Today, the majority has effectively eviscerated this holding. Because I believe the better rule is to allow recovery, under certain circumstances, when fraud induces a plaintiff to hold securities, I respectfully dissent. I would also hold that plaintiff can pursue its claim in this direct action.
Plaintiff The Starr Foundation (plaintiff or Starr) is a charit *34 able foundation whose primary asset is shares of American International Group, Inc. (AIG) stock. Starr is the sole residual beneficiary of the estate of Cornelius Vander Starr. In the nearly 30 years since the settlement of Mr. Starr’s estate, plaintiff has donated more than $2.3 billion to charities and charitable organizations, many based here in New York. Until 2006, AIG stock comprised most of plaintiff’s grants of more than $100,000.
In January 2006, plaintiff held 48 million shares of AIG stock. Its original cost basis was just over 7.4 cents per share. Allegedly out of concern that its assets were not diversified enough, plaintiffs board of directors decided to divest itself gradually of AIG stock. Plaintiff initially set a sale price floor of $70 per share based upon its assessment of the fair market value of the stock, and sold 13.3% of its AIG stock.
By the summer of 2007, problems in. the credit markets began to emerge because of the rapidly rising rate of defaults on subprime mortgages. In response to these market developments, in July 2007, plaintiff decided to lower its sale price floor to $65 per share, and sold an additional 15.7% of its original 48 million shares. However, concerns among AIG investors, plaintiff included, continued to grow about AIG’s exposure to loss from investment products comprised of subprime mortgages and the billions of dollars of credit default swaps that AIG had sold. On August 1, 2007, MarketWatch reported that AIG’s shares had fallen 8% in July as investors worried about AIG’s exposure to subprime debt.
Plaintiff alleges that, in response to investor concerns, AIG undertook a concerted effort to mislead plaintiff and the investing public generally about AIG’s subprime exposure to induce plaintiff and other investors not to sell their AIG shares. Plaintiff alleges that defendants deliberately made false statements to investors and concealed material facts about AIG’s risk of loss in its credit default swap portfolio, and that, in August of 2007, to quell investors’ concerns about AIG, defendants fraudulently reassured investors that the risk of loss from its credit default swap portfolio was minimal.
Specifically, plaintiff alleges, in an investor conference call on August 9, 2007, defendants told investors:
“[I]t is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those [credit default swap] transactions . . . We wanted to *35 make sure in this presentation, we broke out exactly what everything looked like in order to give everybody the full disclosure. But we see no issues at all emerging. We see no dollar of loss associated with any of that [credit default swap] business.”
In the same conference call, defendants further stated that “AIG’s Financial Products portfolio of super senior credit default swaps is well structured; undergoes ongoing monitoring, modeling, and analysis; and enjoy[s] significant protection from collateral subordination.” Plaintiff claims that in reliance on these statements, it did not further revise its sale price floor and continued its gradual divestiture program into September and October of 2007, selling AIG stock only when it was priced at or above $65 per share. Between August 8, 2007 and October 9, 2007, plaintiff sold an additional 26.6% of its original 48 million shares.
During the second week of October 2007, the price of AIG stock dipped below $65. Plaintiff claims that, in reliance on defendants’ reassurances in August 2007, it held fast to its divestiture program and ceased selling AIG stock, because the price had dipped below the program’s floor price.
According to plaintiff, in AIG’s third-quarter Form 10-Q, filed on November 7, 2007, AIG further attempted to reassure investors, stating that it “continues to believe that it is highly unlikely” that AIG would have to make payments related to its portfolio of credit default swaps, that AIG’s credit default swap portfolio had lost a relatively modest $352 million in value during the third quarter of 2007 and that the estimated losses in October 2007 were only $550 million.
Plaintiff alleges that the next day, November 8, 2007, in a conference call with stockholders, defendants stated that the “ultimate credit risk actually undertaken [on its credit default swap portfolio] is remote and has been structured and managed effectively” and that “[w]hile U.S. residential mortgage and credit market conditions adversely affected our results, our active and strong risk management processes helped contain the exposure.” In PowerPoint slides provided to investors for the conference call, defendants repeated that “AIG does not expect to be required to make any payments from this [subprimerelated] exposure.” Finally, plaintiff alleges, on December 5, 2007, at a shareholder meeting, defendants told investors: (1) that the possibility that the unit that sold the credit default swaps would sustain a loss was “close to zero”; (2) that AIG *36 was “confident in [its] marks and the reasonableness of [its] valuation methods”; (3) that AIG’s U.S. residential housing exposure was “manageable given [AIG’s] size, financial strength and global diversification”; and (4) that the valuation models AIG’s subsidiary used “have proven to be very reliable” and “provide AIG with a very high level of comfort.”
Plaintiff contends that in reliance on these continued reassurances, it did not revise its sale price floor and consequently did not sell any shares after October 9, 2007. By the end of 2007, plaintiff had sold 55.6% and granted to its charities 12.5% of its original 48 million shares. Thus, it was left with 31.9% of its shares, or 15,472,745 shares.
According to the plaintiff, on February 11, 2008, AIG filed its Form 8-K with the SEC, revealing for the first time that the value of its credit default swap portfolio had actually dropped by $5.96 billion through November 2007—an amount that was $4 billion more than the figure reported to investors in December 2007. As a result of this disclosure, AIG’s stock fell from $50.68 to $44.74 per share in a single day. On February 28, 2008, AIG filed its 2007 Form 10-K, disclosing that the value of its credit default swap portfolio had dropped by $11.5 billion during 2007. In addition, AIG reported that it lost more than $3 billion in its investment portfolio of residential mortgage debt, and that it had engaged in accounting irregularities with respect to its valuations of the credit default swap portfolio. As a result, AIG’s stock price dropped from $52.25 per share at the close of the market on February 27, 2008 to $46.86 per share at the close of the market on February 29, 2008.
Plaintiff did not sell any of its AIG shares after the truth came to light, admittedly because “it was trading at or around book value and it wouldn’t be rational to sell stock at that price,” and it “had already taken a significant loss at that point, and it just made sense to hold off and see what was going to happen with the stock prices at that point.” Plaintiff still holds its remaining 15,472,745 shares, that, at the time of the filing of this lawsuit, were trading at around $3 to $4 per share.
Plaintiff commenced this action in May 2008 alleging a single cause of action for fraud. Plaintiff claims that defendants made intentionally false statements about AIG’s losses and risks to induce shareholders, including plaintiff, not to sell their AIG stock, that the misstatements caused it to refrain from lowering its sale price floor below $65 per share and to continue to hold shares once the share price fell below that floor in October *37 2007. Plaintiff claims that, as a direct result of AIG’s fraudulent and misleading disclosures, plaintiff now holds assets worth substantially less than before and consequently is less able to provide funding to the many charities it has supported throughout the years.
Defendants moved to dismiss and the motion court granted that motion. In a nutshell, the court held that plaintiff had not stated a cause of action because its damages were too speculative and because it could not assert this cause of action as a direct action. The parties profess some confusion as to whether the court dismissed this action on the pleadings or as a matter of summary judgment. It was entirely appropriate for the court to consider the affidavits and testimony that plaintiff submitted to clarify the complaint on a motion to dismiss the pleading (Leon v Martinez, 84 NY2d 83, 88 [1994]). Moreover, to the extent the court ruled as a matter of summary judgment, defendants agreed the court limited the issue to whether or not plaintiff had sold shares of AIG stock after August 2007, a finding not an issue on this appeal. Accordingly, we review the order of the motion court to the extent it dismissed the case on the face of the complaint and the supplemental evidence plaintiff submitted.
I. Derivative or Direct?
Plaintiff has asserted its claim as a direct action as opposed to a derivative one that would raise issues about whether demand upon AIG’s board of directors was necessary. As an alternative ground for dismissal, the motion court ruled that plaintiff’s claims were derivative of the corporation’s and that therefore plaintiff could not assert them in a direct action. Plaintiff claims this was error because it was appropriate to raise its fraud claim in a direct action. I address this issue first because, if plaintiff cannot assert its fraud claim directly, there is no need to reach any other issues.
A plaintiff asserting a derivative claim seeks to recover for injury to the corporation. A plaintiff asserting a direct claim seeks redress for injury to him or herself individually. Here, Delaware law governs whether plaintiffs claim is direct or derivative, because AIG is incorporated in Delaware (see Finkelstein v Warner Music Group Inc., 32 AD3d 344, 345 [2006]). Under Delaware law, whether a claim is direct or derivative turns solely on: “(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would *38 receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?” (Tooley v Donaldson, Lufkin & Jenrette, Inc., 845 A2d 1031, 1033 [Del 2004].) To state a direct claim, the stockholder’s alleged injury must be independent of any injury to the corporation (id. at 1039).
Typically, where a claim alleges mismanagement, corporate overpayment or breach of fiduciary duty by managers, it is derivative (see e.g. Tooley, 845 A2d at 1038; Gentile v Rossette, 906 A2d 91, 99 [Del 2006]; Albert v Alex. Brown Mgt. Servs., Inc., 2005 WL 2130607, *13, 2005 Del Ch LEXIS 133, *46-47 [2005]). This is because the injury that a shareholder would experience from this sort of misconduct flows out of the injury to the corporate entity (see Albert, 2005 WL 2130607 at *13, 2005 Del Ch LEXIS 133 at *46). By contrast, a plaintiff asserting a direct claim seeks to recover for injury as an individual shareholder or investor (Tooley at 1036). Allegations that a defendant fraudulently induced a plaintiff to invest typically state a direct claim (see e.g. Case Fin. Inc. v Alden, 2009 WL 2581873, *5, 2009 Del Ch LEXIS 153, *16-17 [2009] [misrepresentation that induced plaintiff to pay more than assets were worth stated direct claim]). There are also occasions when “the same set of facts can give rise both to a direct claim and a derivative claim” (Grimes v Donald, 673 A2d 1207, 1212 [Del 1996]).
When the primary claim alleges valuation fraud due to nondisclosure, the claim is usually direct (see Albert, 2005 WL 2130607 at *12, 2005 Del Ch LEXIS 133 at *44; Dieterich v Harrer, 857 A2d 1017, 1029 [Del Ch 2004] [“disclosure allegations are direct claims, as they are based in rights secured to stockholders by various statutes”]; see also Malone v Brincat, 722 A2d 5, 14 [Del 1998] [“When the directors . . . deliberately misinform ( ) shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty. That violation may result in a derivative claim on behalf of the corporation or a cause of action for damages”]).
Defendants, relying primarily upon Lee v Marsh & McLennan Cos., Inc. (17 Misc 3d 1138[A], 2007 NY Slip Op 52325[U] [2007]), argue that plaintiffs fraud claim is derivative because it alleges corporate mismanagement and breach of fiduciary duty that harmed the corporation. While this argument has initial appeal, it is misplaced. In Lee, the plaintiffs may have claimed fraud, but the court found that complaint essentially asserted claims for breach of fiduciary duty and corporate mismanagement. It was this mismanagement that reduced the value of the shares.
*39 Depression of the stock price is often a result of corporate mismanagement. However, a decrease in stock price also results when management purposefully conceals negative facts about the company and the truth subsequently comes to light. Here, plaintiff alleges that defendants perpetrated a fraud by purposefully supplying plaintiff with false information. Plaintiff alleges that defendants intentionally mischaracterized the extent of AIG’s losses and exposure in presentations during investor conference calls on August 9 and November 8, 2007. On December 5, 2007, at a shareholder meeting, AIG told investors that the possibility that the unit that sold the credit default swaps would sustain a loss was “close to zero.” Defendants also made misrepresentations to plaintiff in numerous written communications. For example, defendants mischaracterized AIG’s losses in AIG’s third-quarter Form 10-Q filed on November 7, 2007 and in PowerPoint slides that defendants provided to investors for the November 8, 2007 conference call. Indeed, plaintiff alleges that all AIG’s public filings and financial statements before February 2008 consistently reported only modest declines in the value of AIG’s credit default swap portfolio. Plaintiff claims it relied on this misinformation and kept its floor price at $65 per share instead of lowering its floor price and selling. At the time plaintiff filed this lawsuit, AIG shares were comparatively worthless.
Although corporate mismanagement may have brought about AIG’s overinvolvement in high risk derivative investment products, such as credit default swaps, that is not the issue here. The claim in this case is one of fraud aimed at investors that injured plaintiff. Plaintiff claims it was fraudulently induced not to lower its floor price and to retain its shares because of purposeful misstatements on the part of AIG’s management about AIG’s exposure to the risk of loss. Thus, to the extent plaintiff has suffered injury, that injury is peculiar to plaintiff. Accordingly, a direct action is appropriate (see Case Fin., Inc, 2009 WL 2581873 at *5, 2009 Del Ch LEXIS 153 at *16-17; Fraternity Fund Ltd. v Beacon Hill Asset Mgt. LLC, 376 F Supp 2d 385, 409 [SD NY 2005] [applying New York law]; see also Pension Comm, of Univ. of Montreal Pension Plan v Banc of Am. Sec., LLC, 446 F Supp 2d 163, 205 [SD NY 2006]).
Defendants also argue that the claim is by nature derivative because the decrease in AIG’s stock affected all shareholders alike. However, while the stock price may have decreased for all investors once AIG revealed the enormity of its risk exposure, *40 this does not automatically mean plaintiff lacks a direct claim (see Tooley, 845 A2d at 1038-1039 [rejecting as “confusing in identifying the nature of the action” a bright-line rule that there is no direct injury “if all shareholders are equally affected or unless the stockholder’s injury is separate and distinct from that suffered by other stockholders”]).
II. Plaintiff has Stated A Cause of Action
A. Holder Claims Should Remain Viable under New York Law
Without admitting it, the majority in effect does away with most holder claims. The majority claims it is “evident” that “the Foundation is seeking to recover the value it would have realized by selling its AIG shares before the stock’s price sharply declined.” The majority then states that such a recovery is not permissible in a fraud action under New York law. However, this rule is irrelevant because, as I discuss later, this plaintiff is not seeking to recover lost profits. More important, though, is the end result of the majority’s reasoning. The majority’s formulation does away with nearly every holder claim in which the share price increased from the time of original purchase, regardless of the impact of the fraud upon the sale price. However, this court has long recognized a claim for “fraud in inducing, not the purchase of the bonds, but their retention after purchase”. (Continental Ins. Co. v Mercadante, 222 App Div 181, 183 [1927]). In Mercadante, the defendants induced the plaintiffs to buy and retain securities by conveying false financial information as to the earnings and solvency of the underlying obligor. In holding that the plaintiffs could sue despite that “their conduct was inaction rather than action,” the Court stated:
“The law should not countenance a standard of business morality which would permit vendors of securities to promote a market by publication of false representations and escape the consequence thereof by the contention that the owners of these securities might well have retained them even though the false representations had not been made” (222 App Div at 184, 186).
Mercadante is consistent with the general rule that forbearance from action in reliance upon the intentional misrepresentation of another is actionable fraud (see Channel Master Corp. v Aluminium Ltd. Sales, 4 NY2d 403, 407 [1958]; see also Restate *41 ment [Second] of Torts § 525 [“(o)ne who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation”]). And, until today, Mercadante was considered good law (see e.g. In re Countrywide Corp. Shareholders Litig., 2009 WL 846019, *5, 2009 Del Ch LEXIS 44, *19 [2009] [“Mercadante is still good law despite both its vintage and the extensive intervening developments surrounding securities fraud litigation”]).
Citing Blue Chip Stamps v Manor Drug Stores (421 US 723 [1975]), defendants also urge an end to holder claims altogether. Blue Chip Stamps limited securities fraud claims under section 10 (b) of the Securities Exchange Act of 1934 to those involving the actual purchase or sales of securities, but, in dicta, left open a home in state court for holder claims involving common-law fraud (421 US at 738 n 9). Defendants discuss “the substantial risk of ‘vexatious litigation’ where plaintiffs may use unfounded holder claims to exact settlements from defendants wary of engaging in lengthy and expensive discovery” (quoting Blue Chip Stamps at 743). Defendants point out that proof in holder cases often turns on self-serving oral testimony about what a shareholder might have done had he or she known the truth. Defendants fear that without a rule barring holder claims “ ‘bystanders to the securities marketing process could await developments on the sidelines without risk, claiming that inaccuracies in disclosure caused nonselling in a falling market’ ” (quoting Blue Chip Stamps at 747).
Defendants’ fears are not without foundation. However, there is no reason to turn away from holder claims now simply because unsavory plaintiffs might lie about what they would have done with their stock in an effort to extort a favorable settlement. Certainly, in this day and age, when misrepresentations on the part of large conglomerates nearly brought this nation to its knees, the risk of nonmeritorious lawsuits is equal to the risk of reducing the number of persons available to enforce corporate honesty (see Small v Fritz Cos., Inc., 30 Cal 4th 167, 182, 65 P3d 1255, 1264 [2003] [“The possibility that a shareholder will commit perjury and falsely claim to have read and relied on the report does not differ in kind from the many other credibility issues routinely resolved by triers of fact in civil litigation. It cannot justify a blanket rule of nonliability”]).
*42 Moreover, New York’s requirement of specific pleading in fraud cases, including that plaintiff plead and prove actual reliance, is sufficient to guard against the frivolous lawsuit. To claim fraud under New York law, a plaintiff must plead with particularity: (1) a misrepresentation or omission of material fact; (2) that the defendant knew to be false (scienter); (3) that the defendant made with the intention of inducing reliance; (4) upon which plaintiff reasonably relied; and (5) damages (see e.g. Swersky v Dreyer & Traub, 219 AD2d 321, 326 [1996]). In Small v Fritz Cos., Inc. (30 Cal 4th at 184-185, 65 P3d at 1265-1266), the Supreme Court of California imposed a heightened standard of pleading for the element of reliance in holder actions:
“[A] plaintiff must allege specific reliance on the defendants’ representations: for example, that if the plaintiff had read a truthful account of the corporation’s financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. The plaintiff must allege actions as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations.
“Plaintiffs who cannot plead with sufficient specificity to show a bona fide claim of actual reliance do not stand out from the mass of stockholders who rely on the market” (see also Hunt v Enzo Biochem, Inc., 471 F Supp 2d 390, 411-412 [SD NY 2006]).
This reasoning is sound. New York’s heightened pleading standard for fraud would require no less. Accordingly, to plead reliance in a holder action, a plaintiff should be able to plead with particularity, at the very least, how many shares it would have sold and when it would have sold them. However, given the majority’s reasoning, it is unlikely any plaintiff will get the chance to so plead.
Here, in its complaint and affidavits, plaintiff alleges that defendants’ campaign of misinformation concerning AIG’s risk of loss, starting in August 2007, left plaintiff comfortable with a sale price floor of $65 a share and that plaintiff therefore did not change its divestiture program. Plaintiff alleges that, had it known the truth, it would have sold all its remaining shares within two weeks. Plaintiff supports this claim by pointing to action it did take. Namely, plaintiff continued to sell AIG shares in accordance with its divestiture program to the extent that it *43 was able to achieve a sales price of $65 or greater. Plaintiff also specifies the number of shares (15,472,745) it claims it would have sold had AIG’s repeated false statements not lulled it into complacency. Accordingly, plaintiff has pleaded actual reliance on defendants’ misrepresentations with sufficient particularity to support a holder claim.
B. Direct Communication
Defendants are also of the view that New York should not recognize holder actions in which the only statements plaintiff relied upon were communicated to the entire market simultaneously and the allegedly misleading information is presumably assimilated into the price of the stock traded on efficient national exchanges. Defendants argue that Mercadante is not applicable because that case involved direct communications about the quality of the bonds and, unlike AIG’s shares, those bonds were not available on a national market.
New York law does not generally impose a requirement of face-to-face contact to support a claim for fraud (see e.g. Houbigant, Inc. v Deloitte & Touche, 303 AD2d 92 [2003]). And, in holder cases, courts have routinely upheld claims that did not allege face-to-face communication. For example, allegations that plaintiffs relied on written misstatements are sufficient (see e.g. Pension Comm, of Univ. of Montreal Pension Plan, 446 F Supp 2d at 204-205 [allegations that defendants disseminated fraudulent monthly NAV (net asset value) statements directly to plaintiffs were sufficient to support fraud claim]). Similarly, allegations that defendants disseminated misinformation at investor meetings or in documents filed pursuant to federal law are sufficient (see Gutman v Howard Sav. Bank, 748 F Supp 254, 258-259 [D NJ 1990] [misrepresentations made at a meeting for analysts, in press releases and in forms filed with the FDIC]; see also Hunt, 530 F Supp 2d at 584 [misrepresentations made at annual shareholders’ meeting, “in press releases and news articles, and through the dissemination of insider information to stockbrokers and analysts”]).
Here, the allegations describe communication direct enough to support a claim for fraud under New York law. This includes: (1) the investor conference call on August 9, 2007 during which AIG assured investors that AIG’s risk of loss from credit default swaps was remote; (2) AIG’s November 7, 2007, third-quarter Form 10-Q wherein it stated that it was “highly unlikely” that it would have to make payments related to its portfolio of credit *44 default swaps and severely underestimated the losses that were imminent; and (3) the November 8, 2007 investor conference call and accompanying PowerPoint slides in which AIG repeated that it “does not expect to be required to make any payments from this exposure.”
C. Loss Causation
Defendants argue, and the majority agrees, that plaintiff has suffered no loss attributable to fraud. Defendants reason that, had AIG revealed the truth in August 2007, as Starr contends AIG should have done, the market would have reacted the same way it did in February 2008. Plaintiff would have suffered the same loss, only a few months earlier. Plaintiff would never have had the opportunity to sell its shares at the allegedly artificially inflated stock price, thereby avoiding the decline in value of its AIG stock. Accordingly, defendants argue, plaintiff cannot ever prove damages. In similar fashion, the majority believes that plaintiffs damages are too speculative to be actionable because the calculation of those damages would be “intractable.”
Defendants’ theory, that plaintiff sustained no loss because the market would have reacted the same way had AIG revealed the truth earlier, is initially compelling. It is for this perceived inability to prove loss causation that some courts refuse to recognize holder claims altogether (see e.g. Chanoff v United States Surgical Corp., 857 F Supp 1011, 1018 [D Conn 1994], affd 31 F3d 66 [2d Cir 1994], cert denied 513 US 1058 [1994] [holder claims are not actionable under Connecticut law in part because damages are “not subject to even reasonable estimation”]; Arnlund v Deloitte & Touche LLP, 199 F Supp 2d 461, 488-489 [ED Va 2002] [under Virginia law, plaintiffs could not demonstrate loss causation]).
Nevertheless, despite its surface appeal, a deeper analysis demonstrates that this reasoning falls short. Delayed disclosure resulting from the intentional concealment of unfavorable financial data affects the market in more ways than revealing the true numbers. As Justice Kennard explained in her concurring opinion in Small v Fritz Cos., Inc. (30 Cal 4th at 190-191, 65 P3d at 1270):
“Investors will not only question management’s competence but also its integrity. Investors would have reason to wonder whether there were other, yet undisclosed instances of fraud, and to doubt *45 whether management really recognized its duty to protect the interests of stockholders. Investors would be concerned, too, that lenders would doubt the integrity of the management and question their financial data, affecting the company’s credit status. They would fear that the company might incur the disruption and expense of defending numerous lawsuits . . . .”
Here, AIG painted a rosy picture to investors, only to come clean a couple of months later and admit that its earlier reports were untrue. As we all know, AIG’s ultimate disclosure of the truth not only caused its stock price to plummet, but also roiled financial markets around the world to such an extent that the United States government had to bail out the company. Although undoubtedly there would have been a plunge in the stock price in August 2007 had AIG revealed the true state of affairs at that time, it is certainly reasonable to contemplate that AIG’s deliberate falsehood made the situation much worse when it came to light along with the unfavorable financial news.
Thus, I reject defendants’ conclusion that, because plaintiffs shares traded on an efficient national market, plaintiff sustained no damages. Defendants fail to consider factors other than the current financial health of a company that investors consider when purchasing securities. While separating the loss in value attributable to the fraud from that attributable to the disclosure of truthful but unfavorable financial data may prove difficult, this difficulty does not prevent plaintiff from stating a claim. It is the fact of damages that plaintiff must clearly allege (see Richard Silk Co. v Bernstein, 82 NYS2d 647, 649-650 [1948], affd 274 App Div 906 [1948] [“It is not material that plaintiff has failed to demand the precise damages to which it may be entitled in an action for fraud or that it has mistaken its proper rule of damages”]). The majority may eventually be correct in characterizing the calculation of plaintiff’s' damages as “intractable.” But this is a motion to dismiss. WTiether plaintiff will ultimately, through the use of expert evidence or otherwise, be able to prove damages is a question for another day.
Under the majority’s reasoning, holder claims could never be viable. However, the majority of states that have addressed the issue recognize a cause of action for fraudulently inducing the retention of securities (see e.g. Small, 30 Cal 4th at 173, 65 P3d at 1258; Gordon v Buntrock, 2004 WL 5565141 [Ill Cir Ct 2004]; Reisman v KPMG Peat Marwick LLP, 57 Mass App Ct 100, 112- *46 114, 787 NE2d 1060, 1068-1070 [2003]). Delaware has yet to address the issue. While Delaware does not perjnit holder claims based on “fraud on the market” (see Malone v Brincat, 722 A2d at 13), it presumably might permit holder claims if those claims involved some sort of direct communication. In addition, Manzo v Rite Aid Corp. (2002 WL 31926606, *5, 2002 Del Ch LEXIS 147, *15 [2002], affd 825 A2d 239 [Del 2003]) did not reject holder claims outright, but dismissed the plaintiffs claims for failure to allege legally cognizable damages. In this case, plaintiff alleges that it refrained from changing its sale price floor in reliance on defendants’ misrepresentations.
Many federal courts interpreting state law have also held in favor of permitting holder actions (see e.g. Hunt v Enzo Biochem, Inc., 471 F Supp 2d at 414 [predicting that South Carolina would permit holder claims if defendants made misrepresentations directly to plaintiffs]; Pension Comm, of Univ. of Montreal Pension Plan, 446 F Supp 2d at 204 [New York law]; Rogers v Cisco Sys., Inc., 268 F Supp 2d 1305, 1311 [ND Fla 2003] [Florida law]; Gutman v Howard Sav. Bank, 748 F Supp at 262-264 [New York and New Jersey law]).
The majority would dismiss this case on the premise that plaintiffs claim fails because it violates the “out-of-pocket rule” that precludes recovery in fraud for lost profits. However, it is improper to characterize the damages plaintiff seeks as “lost profits.” Plaintiff seeks to recover the fair market value loss on the stock that it would have sold in the absence of AIG’s fraud. Thus, plaintiff merely seeks to restore itself to the position it occupied without the fraud. This is not profit (see Bernstein v Kelso & Co., 231 AD2d 314, 322 [1997]). That plaintiff may have originally had a low cost basis also has no bearing. A decline in the value of a stock affects the net worth of a stockholder. It can affect the ability of a company to borrow money or obtain insurance. In Starr’s case, the decline in stock value allegedly affected the charitable donations it was able to make because those donations often took the form of stock grants. Starr held stock in August 2007 because it relied on defendants’ false words. Starr is entitled to try to prove that it suffered a loss because, if defendants had disclosed the truth in August 2007, the value of the stock would not have dropped as much then as it did in February 2008.*
*47 Defendants also make much of plaintiffs testimony at the hearing on November 17, 2008, through Ms. Davis, that she could not speculate whether the Foundation would have sold all its AIG stock if AIG had made the February disclosure back in August 2007. Defendants argue that this shows that plaintiff admits its claim is speculative. This interpretation misreads plaintiffs allegations. Plaintiff claims it was fraudulent for AIG not to reveal its exposure to risk of loss earlier. The question posed to plaintiff was what plaintiff would have done had an actual loss occurred (and been revealed) earlier. Plaintiffs hearing testimony does nothing to undercut the allegations that it suffered damages because it retained stock that it would have sold by accelerating its divestiture program had it known the true risk of loss earlier.
Finally, defendants and the majority point out that, even after the alleged fraud became public, plaintiff did not sell its shares. They argue that this undercuts plaintiffs allegation that, had it known the truth, it would have sold the remainder of its AIG stock. However, one does not have to sell stock to experience injury. The reduction in value of stock holdings reduces the net worth of the stockholder. In plaintiffs case, this reduction was particularly harmful because plaintiff, a charitable organization, often made its donations in the form of stock grants. Moreover, it is not for the court, but for the factfinder, to second-guess plaintiffs motives and investment strategy once the loss occurred.
Gonzalez, PJ., Renwick and Freedman, JJ., concur with Friedman, J.; Moskowitz, J., dissents in a separate opinion.
Orders, Supreme Court, New York County, entered December 3 and 19, 2008, affirmed, with costs.

 The majority criticizes plaintiff because it did not offer a “description of the methodology that was used to set the floor price, nor does it give even a *47 rough estimate of the floor price that would have been set had AIG accurately represented the risk of the CDS portfolio in the late summer and fall of 2007.” However, at this motion to dismiss stage, plaintiff is not required to divulge its methodology or to estimate the floor price. The majority’s conclusion that plaintiff cannot allege with particularity how many shares it would have sold and when without revealing its methodology is a non sequitur. Were this case to proceed, undoubtedly plaintiff would reveal in discovery how it set its floor price.